# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| 659 CHESTNUT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N17C-05-114 MMJ |
| | ) | |
| PARKE BANCORP INC., d/b/a | ) | |
| PARKE BANK, | ) | |
| | ) | |
| Defendant. | ) | |

Decided: December 6, 2018

## POST-TRIAL OPINION

Kevin J. Mangan, Esq., Womble Bond Dickinson (US) LLP, Richard A. O'Halloran, Esq., Dinsmore & Shohl LLP, Attorneys for Plaintiff

Benjamin W. Keenan, Esq., Don A. Beskrone, Esq., Ashby & Geddes, P.A., Attorneys for Defendant.

**JOHNSTON, J.**

This is a case about mutual mistake. The operative contract contains specific language providing for a prepayment penalty. Plaintiff alleges that the contract does not reflect the parties' actual agreement that no prepayment penalty is owed to Defendant.

A bench trial was held to resolve this issue on November 19-20, 2018. This is the Court's opinion following trial.

1

## UNDISPUTED FACTS

Plaintiff 659 Chestnut LLC ("Plaintiff") and Defendant Parke Bancorp Inc., d/b/a Parke Bank ("Defendant" or the "Bank") have stipulated to the following facts.

Plaintiff is the owner of a property (the "Property") located at 659 East Chestnut Hill Road, Newark, DE.

After purchasing the Property on October 2, 2015 for $750,000, Steven Fasick ("Fasick"), who would later form and be a member of Plaintiff, and a business partner, David Grayson ("Grayson"), began construction of a building (the "Building") on the Property in the fall of 2015. The Building was constructed to house a mental health service called Recovery Innovations International, Inc. ("Recovery Innovations"). Fasick is a board member of Recovery Innovations, and was charged with locating the site and constructing the Building. He was under time pressure to do this, because the State of Delaware was under pressure from the federal government to expand its drug and substance abuse recovery services, and the State was relying on Recovery Innovations to supply the expanded services.

Recovery Innovations faced the possibility of losing its contract with the State of Delaware if Fasick did not move quickly. Fasick and his partner began preparing the site within a month of Fasick's purchase. They initially began

2

construction with their own funds, and had made significant progress at the time Fasick negotiated a deal with the Bank concerning the Loan at issue in this matter. During the time Fasick negotiated the Loan terms in February, 2016, the pressure to move forward with construction of the Building had increased to the point where Fasick was receiving "threats that we were going to lose our program and our agreement with the State if we were not able to get this thing up and running very quickly."

Fasick worked with Timothy Cole ("Cole") to negotiate proposed terms of the Loan (the "Proposed Terms"). Cole was a Vice-President and Commercial Loan Officer for the Bank at the time of the negotiations and up through the time of the Closing and is now a former employee of the Bank. The Proposed Terms were structured as a "Construction/Permanent" loan, which would include terms for financing the construction of the Building, and optional terms for permanent financing after construction was complete. Fasick's negotiations with Cole began in late 2015, but the Proposed Terms were not documented until mid and late February of 2016 in the weeks prior to the March 4, 2016 Closing.

During the course of Fasick's negotiations with Cole, Fasick and Grayson formed Plaintiff as the entity that would enter the Loan with the Bank and own the Building.

As a loan officer for the Bank, Cole did not have authority to bind the Bank to loan terms. Accordingly, both Cole and Fasick understood during the course of their negotiations that the terms they discussed were only Proposed Terms, and the Proposed Terms required both final documentation and approval by the Bank's loan committee ("Loan Committee") to become binding on the Bank.

The Proposed Terms that Fasick negotiated with Cole, among other things, provided funding for Fasick's purchase of the Property as well as construction of the Building, ultimately requiring zero dollars out of Fasick's pocket as of the last draw on the construction portion of the Loan. Fasick viewed these Proposed Terms favorably. In Fasick's words, the Proposed Terms provided "essentially [] zero percent financing on a construction perm loan which nobody does."

The Proposed Terms of the Loan were set forth in two documents, an Application for Permanent Loan Commitment ("Loan Application"), which would be reviewed and signed by the borrower, and a Transaction Summary ("Transaction Summary"), which would be presented to the Bank's attorneys to use as the basis for preparing draft final loan documents and which would also be presented to the Bank's Loan Committee for approval. The Proposed Terms of the Loan were documented in drafts of the Loan Application and the Transaction Summary. The drafts contained language relevant to the parties' dispute whether the Proposed Terms of the Loan were intended to include an option period during

4

which the Plaintiff could prepay the Loan after the end of the Construction Period but before the end of the Construction Loan Term, without a penalty.

A timeline for the drafts of the Loan Application and Transaction Summary, and the approval for the Loan is set forth below:

2/10/16 – The initial drafts of the Loan Application and Transaction Summary were prepared. These documents included express language providing a 90-day period following issuance of a certificate of occupancy during which Plaintiff could refinance the loan without a Prepayment Penalty. In the 2/10 draft Transaction Summary, Cole noted the proposed waiver period was "FOR DISCUSSION – I really don't want the above provision and want to remove it but need to discuss what flexibility I have in negotiating a floor for the Permanent Term that would be close to competitive in the current market…" Both of the documents defined the Construction Loan Term as a period lasting up to six months, with a 90-day period after issuance of a certificate of occupancy during which Plaintiff could prepay the Loan without penalty and prior to the Loan converting to a permanent loan term (the "Permanent Loan Term").

2/18/16 – The final version of the Loan Application (the "Loan Application") was prepared. The express language providing the 90-day waiver period for the Prepayment Penalty was removed in this draft. It was replaced with language that provided a 1% Prepayment Penalty if paid during the "Construction Period", which was defined as the period of time from Closing until the issuance of a certificate of occupancy and commencement of rent. The Loan Application provided a prepayment penalty rate on a sliding scale of 5%-1% if paid after the Loan entered the "Permanent Loan" period and before the end of the Permanent Loan Term. The Loan Application also included a provision that waived the Prepayment Penalty in the event of sale of the Property to an unrelated third party. The Loan Application identified the Construction Loan Term as 12 months, and provided that Plaintiff would pay amortizing payments (the "Amortizing Payments") of interest and principal based on a fixed principal payment of $2,000 per month after rent commenced during the Construction Loan Term. The Loan Application did not provide

5

express language addressing whether the issuance of a final certificate of occupancy would end the Construction Loan Term, or providing an option period after the issuance of a final certificate of occupancy during which Plaintiff could prepay the Loan without penalty prior to the Loan entering the Permanent Loan Term.

On February 18, 2016, after reading the Loan Application and in advance of signing the Loan Application, Fasick contacted Cole by email (the "February 18, 2016 Email Exchange") seeking clarification about the prepayment penalty. Fasick contacted Cole because he did not believe the relevant language "was clear enough." Fasick shared his understanding that the terms of the Loan Application provided a period from the end of the Construction Period until the end of the one-year Construction Loan Term during which Plaintiff could prepay the Loan without a penalty. In response, Cole assured Fasick, "Yes. You are reading it correctly. I need to obtain final approval of the loan committee, but this is the exact wording in the revised loan approval package."

2/22/16 – The final version of the Transaction Summary (the "Transaction Summary") was prepared. It included the same or substantially same Construction Period language as in the Loan Application. The Transaction Summary defines the Construction Period as the period from Closing until the tenant's commencement of payment of rent and the issuance of a Certificate of Occupancy for the Property, and references this definition in three sections regarding the Loan Amount, Guarantors and the Prepayment Penalty. The Transaction Summary identified the "Maturity (Term)" for the Construction Loan as 12 Months. The Transaction Summary also included the Amortizing Payments.

2/24/16 – After preparing draft Loan Documents including, among others, a Construction Loan Note (the "Note"), Construction Loan Agreement ("Loan Agreement"), Mortgage and Security Agreement ("Mortgage") and related documents (collectively, the "Loan Documents"), the Bank's attorneys, Cahill Wilinski Rhodes and Joyce (the "Cahill Firm") forwarded the draft Loan Documents to Cole, Fasick and, and Plaintiff's attorney, Gary Bryde, for review and comment. Cole forwarded additional copies of the Loan Documents to Fasick and Bryde on the same day. The terms concerning the

Prepayment Penalty set forth in the draft Note did not contain an option period during which there would be no Prepayment Penalty. Same as in the Loan Application and Transaction Summary, the draft Note provided a 12-month Construction Loan Term. The draft Note did not include the Amortizing Payments.

The terms of the draft Note provided that the Construction Loan Term ended upon the earlier of the issuance of the final certificate of occupancy or the one-year anniversary of Closing, at which time the Loan converted to the Permanent Loan Term with no intervening option period during which the Prepayment Penalty would be waived. During the Construction Loan Term, the Note provided a 1% Prepayment Penalty. During the Permanent Loan Term, the Note provided a Prepayment Penalty on a sliding scale of 5%-1% during the first five years of the Permanent Loan. In the first year of the Permanent Loan Term, the Note provided a 5% penalty rate.

3/1/16 – The Cahill Firm again forwarded the draft Loan Documents to Fasick, attached to an email from Doug Joyce ("Joyce") of the Cahill firm which said 'Steve: Here are the draft docs for the closing in case you want to review beforehand.' The draft Loan Documents sent to Fasick on March 1, 2016 included the draft Note with the same Prepayment Penalty Terms that did not contain a waiver of the Prepayment Penalty, and the same provisions concerning the conversion of the Construction Loan Term to the Permanent Loan Term upon issuance of a final certificate of occupancy.

3/3/16 – The Loan Committee unanimously approved the $3,375,000 Loan as set forth in the Transaction Summary, subject to the addition of a 1% Prepayment Penalty in the event the Property was sold to an unrelated third party. Cole presented the Loan to the Loan Committee at the Loan Committee meeting. Neither Fasick nor Bryde provided comments to the Cahill Firm regarding the Prepayment Penalty terms in the Loan Documents prior to the Loan Committee's approval of the Loan.

3/4/16 – The Loan closed and funded on March 4, 2016. At Closing, Plaintiff signed the Loan Documents. Plaintiff's signatures were witnessed and/or notarized by Plaintiff's attorney. The terms in the Loan Documents concerning the Prepayment Penalty were the same

as the terms in the draft forwarded to Fasick, Bryde and Cole on February 24, 2016 and to Fasick again on March 1, 2016 for their review, except for the revisions concerning a Prepayment Penalty in the event of a sale of the Property to an unrelated third party. The Loan Documents included the same terms providing that the Construction Loan Term automatically converted to the Permanent Loan Term upon issuance of a final certificate of occupancy without any option period during which Plaintiff could prepay the Loan without a Prepayment Penalty. The terms in the Loan Documents did not include the Amortizing Payments. Fasick and Bryde provided no comments to the Cahill Firm or the Bank concerning the Prepayment Penalty terms in the Loan Documents prior to signing the documents at Closing. Joyce did not attend Closing on behalf of the Bank due to other obligations. Patrick Hennigan ("Hennigan") of the Cahill Firm attended Closing on behalf of the Bank.

One of the Loan Documents, the Mortgage, includes an integration clause in paragraph 24 providing "This Mortgage (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Mortgagor and Mortgagee with respect to the subject matter hereof." The Note includes terms on page 2 providing "Borrower waives any rights it may have under applicable law to object to or avoid payment of the prepayment premium…" The Loan Agreement provides, in Section 14.13, as follows: "Further Assurances. The parties hereto agree that at any time, and from time to time after the Closing Date, they will execute, acknowledge and deliver other assurances, financing statements, documents, agreements, and amendments or supplements thereto or to the other Loan Documents and take such other action as may reasonably be required for correcting any errors or omissions in order to carry out the intention of or facilitating the performance of this Agreement or any other Loan Document."

As a requirement of the Loan, Plaintiff's attorney Bryde provided an Opinion Letter, dated March 4, 2016 (the "Opinion Letter"), on Plaintiff's behalf stating "the Loan Documents constitute legal, valid, and binding obligations of the Borrower, enforceable against it in accordance with their respective terms."

8

On or about June 20, 2016, Fasick approached the Bank and requested that the Loan Documents be reformed to reflect his understanding, based on his February 18, 2016 Email Exchange with Cole concerning the Loan Application, that the Loan would include an option period with no Prepayment Penalty. After that date, Fasick began ongoing communications with the Bank related thereto.

Recovery Innovations commenced payment of rent on July 1, 2016 (the "Rent Commencement Date"). The Bank did not require that Plaintiff make any Amortizing Payments after the Rent Commencement Date, and the Bank did not seek by this action to require Plaintiff to pay any Amortizing Payments. Plaintiff did not pay any Amortizing Payments after the Rent Commencement Date, and Plaintiff did not seek by this action to pay any Amortizing Payments to the Bank.

The County of New Castle issued the final Certificate of Occupancy (the "CO") for the Building on October 17, 2016. On October 21, 2016 Plaintiff paid off the Loan and obtained permanent financing from Bryn Mawr Bank.

The Payoff Letter, dated October 21, 2016, provides and includes a Prepayment Penalty of $33,750, reflecting a 1% Prepayment Penalty rate. The Payoff Letter states "All payoffs are subject to final audit." Plaintiff paid the Prepayment Penalty on October 21, 2016 under a reservation of rights.

On November 22, 2016 Defendant recorded a Satisfaction of Mortgage with the New Castle Recorder as Instrument No. 20161122-0061207, thereby canceling and satisfying of record the Mortgage given to Defendant by Plaintiff to secure the Loan.

9

## DECISION AFTER TRIAL

### *Mutual Mistake*

To establish mutual mistake, the Plaintiff must prove, by clear and convincing evidence, that: "(1) both parties were mistaken as to a basic assumption, (2) the mistake materially affects the agreed-upon exchange of performances, and (3) the party adversely affected did not assume the risk of the mistake. Under principles of contract law, a contract is voidable, *inter alia*, on the grounds of mutual mistake existing at the time of contract formation."[1]

### *Findings of Fact*

On February 18, 2016, Cole (then Vice President of Commercial Lending at Parke Bank) sent Fasick a revised term sheet by email. Cole reminded Fasick that the terms were subject to approval by the Bank's Loan Committee.

Fasick responded:

> I think it looks good assuming I understand it correctly.
> Just so I'm not confused I'll think out loud here....I
> believe it reads that the prepayment penalty exists only
> for the defined "construction period" and then ends.
> Then there's a gap with no prepay during the period
> between the CO/rent commencement time and the end of
> the 12 month loan period. Also, during that period after
> occupancy im paying interest plus $2000 (and no prepay
> penalty) for up to 12 months while I have the option to

---

[1] *Hicks v. Sparks*, 2014 WL 1233698, at *2 (Del.).

convert to the perm. Then the 5,4,3,2,1 prepayment kicks in if I take the perm unless the property is sold. So, the key is that it gives me a window between the CO and accepting a perm where im not penalized to pay it during that window. I believe Im reading it right and yes that works great. I really appreciate what you've been able to do. I know you have a lot of time into this. We'll make it up fast. Let me know if I understand the language the way you intended it. Thanks much!

Cole replied:

Yes. You are reading it correctly. I need to obtain the final approval of the loan committee, but this is the exact wording in the revised loan approval package.

Both Fasick and Cole testified that they had a clear understanding that the loan agreement would provide a window within which a prepayment penalty would not be owed.

The Transaction Summary dated February 22, 2016 was presented to the Bank's Loan Committee. The Summary defines "Construction Period" as the "time from Closing until the Issuance of the CO [certificate of occupancy] and the Commencement of Rent." The "Prepayment Penalty" section provides for a 1% penalty during the Construction Period. The prepayment penalties for the "Permanent Loan" vary from 5% to 1%.

The Summary contains four references to "Permanent Loan Option." An attorney with the law firm that drafted the loan documents testified that "Option"

11

means choice. Additionally, the documents do not make clear whether the choice to convert from construction to permanent loan is the lender's or the borrower's.

The Bank's attorneys used the Summary as the basis for drafting the loan documents. The resulting March 4, 2017 Construction Loan Note contained the Bank's standard language that "the Loan shall convert to an amortizing, permanent loan...." This provision is not consistent with the "Option" in the Summary. The Bank's attorney testified that "shall convert" is not the same as "Option." Additionally, an option to convert is not standard Bank practice.

Upon receipt of the loan documents prior to closing, Cole marked up the draft Construction Loan Note by hand. Cole attempted to correct the prepayment provision pursuant to his understanding and agreement with Fasick. Instead of requiring a prepayment penalty "During the Construction Loan," Cole's handwritten notes state that a prepayment penalty would be owed "During the Construction Period (defined as until issuance of CO and commencement of rent)." This alteration limits the prepayment penalty period and provides a window for no prepayment penalty from the conclusion of the Construction Period until the end of the Construction Loan.

Cole testified that it was his general practice to call Bank attorneys with proposed changes. He believes he called the attorneys with the change to the prepayment penalty terms. However, Cole has no specific recollection of making

12

such a call. He stated that there was a short time frame until closing and events were moving quickly. The Bank's attorney also has no specific recollection of receiving a call from Cole.

Fasick testified that he understood that the Summary needed to be presented to the Bank's Loan Committee for approval. Fasick did not review the final documents, including the Construction Loan Note, prior to closing. He relied on the Bank's attorneys to draft documents reflecting the agreed terms. Fasick had confidence in Cole and in the Bank's attorneys.

The Loan Committee minutes indicate that the relevant prepayment penalty provision was not addressed. The only changes made during the meeting were to contract terms not at issue in this case: a prepayment penalty of 1% if the Property were to be sold to an unrelated party; a change from first to second mortgage lien on collateral; and a line of credit issue.

Neither Cole nor Fasick read any of the loan documents at the closing table. Cole also stated that he relied on the Bank's attorneys to "get it right."

The Commitment Letter was signed after the loan closed. The Loan Commitment, also drafted by the Bank's attorneys, states that the Construction Loan "shall convert" to a Permanent Loan. The Commitment does not define "Construction Period" or contain any language regarding a prepayment penalty window.

13

Beginning July 27, 2016, Fasick sent detailed email correspondence to the Bank's Senior Loan Officer. In anticipation of paying off the Construction Loan, Fasick requested that the Officer confirm that there would be no prepayment penalty during the agreed window following the end of the Construction Period. Fasick stated his intention not to exercise the option to convert to a permanent loan. Fasick and the Officer had a telephone conference on August 5, 2016. Fasick followed with another detailed email, reiterating his understanding of the terms of the loan and his reliance on that understanding. The Officer did not respond to this email.

The construction loan was paid off on October 21, 2017. The borrower's attorney notified the Bank in writing that the "payoff is with reservation of all rights with regard to the prepayment penalty as our position is that it is not owed and it is in contradiction with the term sheet and commitment provided by...Cole."

The Officer testified that the loan automatically converted to a Permanent Loan as per the Commitment Letter. Therefore, the Permanent Loan provisions controlled at the time of payoff of the Construction Loan. The prepayment penalty charges by the bank is consistent with the formula set forth in the loan documents.

14

### *Conclusions Based on the Evidence*

The Court finds that Fasick and Cole clearly agreed that there would be no prepayment penalty between issuance of the final certificate of occupancy/ commencement of rent and the termination of the Construction Loan 12-month term. The term "Construction Period" defined that window. The parties understood that the Transaction Summary is not a binding agreement. However, the Summary is evidence of the agreement between Fasick (the borrower's agent) and Cole (the Bank's agent). The fact that this agreement may not have been adequately communicated to the Bank's attorneys does not mean that there is not a mutual mistake as reflected in the drafted closing documents.

The Court finds that Plaintiff has proved mutual mistake by clear and convincing evidence. The evidence at trial demonstrated that the borrower closed on the Construction Loan in the mistaken belief that the specifically-negotiated prepayment penalty window was codified in the loan documents as drafted by the Bank's attorneys. The Bank's primary customer representative, Cole, proceeded to loan closing in the mistaken belief that the changes he had made to the Construction Loan Note had been incorporated by the Bank's attorneys. These mutual mistakes materially affected the agreed-upon exchange of performances.

Fasick and his attorneys had the opportunity to review the documents prior to closing. However, the time frame was extremely tight and there was no notice

15

(other than the documents) that the Bank's loan committee had not approved the prepayment penalty window. To the contrary, Fasick had explicit reassurance from Cole that their understanding was incorporated in the loan documents. Therefore, the adversely-affected borrower did not assume the risk of the mistake.

## CONCLUSION

Under principles of contract law, a contract is voidable on the grounds of mutual mistake existing at the time of contract formation."[2] The Court holds that Plaintiff has proved mutual mistake by clear and convincing evidence.

The loan documents are inconsistent with the parties' agreement in two important respects. (1) The defined "Construction Period" was omitted and the agreed prepayment penalty window following the Construction Period was not incorporated. (2) The "Option" to convert from Construction Loan to Permanent Loan was erroneously drafted as an automatic conversion from construction to permanent.

The Court holds: the payoff occurred after the Construction Period and prior to the termination of the Construction Loan (the window within which no prepayment penalty would be owed); and the loan was not in Permanent Loan status at the time of payoff. Therefore, there is no prepayment penalty owed pursuant to the Permanent Loan formula.

The verdict after trial is for Plaintiff and against Defendant on the counterclaim.

**IT IS SO ORDERED.**

The Honorable Mary M. Johnston

---

[2]*Hicks v. Sparks*, 2014 WL 1233698, at *2 (Del.).